RECEIVED
FEB 19 2026
KELLY L. STEPHENS, Clerk

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

**JOHN KLOSTERMAN,**

**Plaintiff-Appellant,**

**v.**                                                    **Case No. 26-3118**

**KONZA, LLC, et al.,**

**Defendants-Appellees.**

_____

## MOTION FOR EMERGENCY INJUNCTIVE RELIEF
## AND LEAVE TO PURSUE CLASS ACTION CLAIMS
## REGARDING THE CITY OF CINCINNATI'S
## MUNICIPAL FINE-TO-FORECLOSURE FINANCIAL SCHEME

**PREFATORY STATEMENT: THIS COURT SHOULD KNOW WHAT IT IS LOOKING AT**

Appellant John Klosterman is 76 years old. He is pro se. He has been fighting this battle for over 20 years while the City of Cincinnati, Hamilton County, and their associated attorneys have done what powerful institutions always do to pro se litigants who get too close to the truth: stall, bury, dismiss on procedure, and wait. The strategy is ancient and Appellant recognizes it completely. Protect the family. Keep it quiet. The old man will go away eventually. He always does.

In 1954, Marlon Brando stood on a rooftop in Hoboken, New Jersey—in the film *On the Waterfront*—and told the truth about a mob-controlled system that destroyed working men's lives while lawyers and politicians looked the other way. The men who ran the docks knew the same thing the City of Cincinnati knows today: if you control the machinery, control the courts, and outlast the opposition, you win. Terry Malloy didn't go away. Neither will John Klosterman.

In 1973, Senator Howard Baker asked the question that unraveled a presidency: "What did the President know, and when did he know it?" The Watergate tapes answered that question. The Nixon administration's greatest mistake was not the break-in. It was the cover-up—burying the evidence, issuing no report, hoping the whole thing would disappear. This Court is respectfully asked the same question about Inspector Kevin Rhodes: What did Rhodes know, and when did he know it? He walked and inspected the building a day before the public nuisance hearing. He attended the hearing. He heard three witnesses present sworn evidence and the GEI structural report. THe board issued no report. The cover-up is documented.

Appellant also asks this Court to be aware that the nine African-American property owners whose land was seized through this identical condemn-bill-foreclose pipeline to make way for the FC Cincinnati Stadium and the MLK interchange at Reading Road and Interstate (case 1:24-cv-00214-DRC)those nine families received <u>zero compensation</u> . The pipeline has been identified. The mechanism has been exposed. The only question remaining is whether this Court will allow it to complete one more cycle before it is stopped.

2

## I. EMERGENCY INJUNCTIVE RELIEF FOR TWO PROPERTIES

### A. 621/623 Delhi Avenue — Six Acts of Documented Fraud

1. The property at 621/623 Delhi Avenue, Cincinnati, Ohio—both parcels on a single deed—has been the target of a six-act campaign of fraudulent enforcement that is documented, sworn, and supported by the City's own inspector's statements:

(a) Inspector Terry James issued a fraudulent condemnation in 2020 after receiving and ignoring a GEI Engineering structural report confirming both 621 and 623 Delhi living quarters were sound and habitable;

(b) James later admitted to former tenant Randy Hatfield that "the building was structurally safe" and Hatfield "didn't have to move";

(c) The City imposed $15,015.00 in VBML fees for a vacancy the City itself created;

(d) Approximately one year ago, a formal public nuisance hearing was held. Inspector Kevin Rhodes personally walked the 621 building units prior to that hearing, stated the temporary stabilization was adequate, and confirmed he was not in danger anywhere he walked. At the hearing,I for the third time provided the GEI Engineering report. It was entered into evidence. Randy Hatfield appeared with his affidavit. Mike Avery, maintenance manager, appeared with his affidavit. Three witnesses. Sworn evidence. A structural engineer's report. Rhodes heard all of it. No report was issued. No finding

was recorded. No ruling was ever produced. The City buried the evidence and sent a $15,015.00 VBML bill;

(e)  On February 3, 2026, the City's automated system issued a $750.00 citation (Notice B202505918) that Inspector Shawn Fehn II—who signed it—later confirmed was his own mistake. Fehn asked Appellant to photograph the fine so he could identify it. When asked if he knew 621 Delhi was the subject of a federal RICO action, Fehn replied: "I did not know!"; and

(f)  On February 10, 2026—while this appeal was pending—Inspector Rhodes's office issued VBML Case No. B202601272, a $3,640.00 invoice against 623 Delhi Avenue. On October 8, 2025, Inspector Shawn Finn had personally appeared at 623 Delhi, inspected the occupied second-floor apartment with maintenance representative Richard Harris present, confirmed five smoke detectors installed and operating, found zero violations, and verbally cleared the building. The building has had active tenants for over ten consecutive years. A new tenant moved in three weeks before the invoice was issued. No hearing was held. No notice was given. No human reviewed it. The machine generated a $3,640 bill because  Inspector Fehn  failed to update the City's records. The GEI report sat in the file. The hearing transcript sat buried. The invoice printed anyway.


**2.  Inspector Kevin Rhodes is not an anonymous bureaucrat who missed a paperwork update. Rhodes is the son of the Hamilton County Auditor who held that office for over thirty years—a name that carries significant political weight in this county's governmental culture. He attended the public nuisance hearing. He walked the building. He confirmed**

the temporary stabilization was adequate and that he was not in danger anywhere he walked. He heard three witnesses present sworn evidence. He then issued no report and no finding—the institutional equivalent of the Watergate tapes being erased. This Court is asked to order Inspector Rhodes to explain in writing, within 14 days, why no report was ever issued from that hearing. Klosterman called a week after the hearing and asked where the report was. " We will get it to you". If the evidence was sufficient to dismiss the public nuisance claim—and Rhodes's own statements suggest it was—then the $15,015 VBML bill that followed was extortion. If the evidence was not sufficient, Rhodes had a legal obligation to say so in writing. Silence was not an option the law permitted. The absence of a written finding from a formal hearing is itself a due process violation.

3.  The lawyer's playbook is not lost on Appellant. When a government entity knows it has lost on the evidence, the standard response is: issue no ruling, make no written finding, and let the administrative machinery continue to run. No ruling means no appealable order. No appealable order means no judicial review. The property owner has no decision to appeal, no finding to contest, and no court to run to—while the fines accumulate, the liens grow, and the foreclosure clock ticks. Appellant has seen this game played against him, against his neighbors, and against nine African-American families whose land was taken for the FC Cincinnati Stadium. This Court has the power to end the game at this property by ordering what the law already required: a written finding from the public nuisance hearing and the taped transcript of the hearing.

4.  The fraudulent condemnation order remains on the property record in Eztract. The VBML fees remain outstanding. Both new notices remain pending. Without injunctive relief, the City will continue to accumulate fines and fees on this property until foreclosure

becomes inevitable—completing the same pipeline that seized Appellant's other 60 properties and the nine families' land that now sits under an FC Cincinnati Soccer Stadium and a highway interchange.

**B. 5615 Sidney Road — The City Follows the Man, Not the Property**

5. Appellant's home at 5615 Sidney Road is under tax foreclosure (Hamilton County Case No. A2505484). Appellant and his late wife were current on their home taxes for their entire lives—until co-conspirators Boydston and Lentine, through the receivership scheme, stripped all rental income from Appellant's investment properties.

6. When Appellant reviewed the foreclosure amounts, he discovered that the City of Cincinnati appears as a creditor in the foreclosure of his home—based on fines and fees assessed against his investment properties for violations that occurred at those investment properties. No violation of any kind ever occurred at 5615 Sidney Road. Under Ohio law and the City's own Municipal Code, fines attach to the property where the violation occurred. The City did not follow the property. The City followed the man. This is not a code enforcement error. This is a personal financial weapon aimed at the man who has been fighting this machine for over 20 years.

7. Worse, Appellant believes the City double-billed these fines—placing them on both the investment properties tax records for future foreclosure and on 5615 Sidney Road. If confirmed through discovery, the City has already collected these fines once through the receivership of the investment properties, and is now attempting to collect them a second time through the foreclosure of Appellant's home. The full circle: co-conspirators steal Appellant's income → the City imposes fines Appellant can no longer pay → the fines

become liens on his home → the City forecloses → the City collects the fines it imposed to support the scheme that stole the income that would have paid them.

## C. The Machine Never Stops: The Court Is Watching the Crime in Progress

8. Not a single day passes without a new fraudulent act. February 3: automated citation, inspector agrees it was his mistake. February 10: $3,640 VBML invoice for an occupied building cleared by the City's own inspector—then Rhode, district inspector, who personally walked 621 Delhi  building a year ago, heard three sworn witnesses, and issued no report. This is not a case of ancient grievances being relitigated years after the fact. These are fresh acts committed while this appeal was pending. The Brando character in *On the Waterfront* asked: who is going to stop the machine? The machine is running right now. This Court can stop it.

## D. Injunctive Relief Standards — All Four Factors Satisfied

9. Under FRAP Rule 8, the four factors decisively favor Appellant: (1) Likelihood of success: Receiver Boydston confessed under oath to an "engineered sale"; co-conspirator Lentine is serving 63 months; HCLRC admitted concealment of $423,169 in sworn filings; Inspector Rhodes attended a formal hearing, heard sworn evidence of habitability, and issued no report—the cover-up is documented. (2) Irreparable harm: loss of Appellant's home  property cannot be remedied by money damages. (3) Balance of equities: the City manufactured the financial distress through the RICO enterprise and should not profit from the foreclosure it caused. (4) Public interest: stopping a municipal extortion scheme that has already consumed 60 properties and nine African-American families' land serves the public interest of every property owner in Cincinnati.

## II. THE CITY'S FINES-AS-FINANCIAL-INSTRUMENTS SCHEME

**10.** The City of Cincinnati has not constructed a code enforcement system. It has constructed a financial engineering operation that transforms minor municipal citations into balance sheet assets, using citizens' homes as collateral for a revenue stream that operates outside the democratic accountability of taxation. The seven-step pipeline:

**Step 1:  Issue disproportionate fines.** $500 for uncut grass. $250 for an overflowing trash can. Grossly disproportionate to any actual cost or harm.

**Step 2:  Charge landlords for tenant conduct.** A landlord with 59 units faces liability for every tenant's trash day habits. The City collects from the person with property to take, not the person who created the problem.

**Step 3:  Double automatically without hearing.** No judicial review. No consideration of circumstances. The $500 fine becomes $1,000 by computer. *Timbs v. Indiana*, 586 U.S. 146 (2019).

**Step 4:  Convert to tax lien.** <u>The fine transforms into a secured financial instrument backed by real property. It is no longer a citation. It is a bond.</u>

**Step 5:  Accrue interest.** Time becomes the City's ally. Every month increases the City's claim.

**Step 6:  Book as accounts receivable.** The City records these accumulated liens as assets on its financial statements. Every fine increases the City's balance sheet. The City has a direct financial incentive to issue more citations, not fewer.

**Step 7: Collect through foreclosure or title transfer. The City waits at the closing table or the foreclosure auction and converts its manufactured accounts receivable to cash.**

11. Appellant did not discover this financial engineering by accident. Before the IBM PC existed, Appellant programmed microcomputers in the CP/M operating system—64K of memory—and wrote proprietary accounts receivable software that he sold for twenty years to medical and dental practices in Cincinnati. He audited books, followed receipts to bank deposits, and was 100% successful in identifying theft—including a case where a physician's own daughter had embezzled over $100,000 (approximately $550,000 today). Appellant recognized the City's pipeline as an accounts receivable system because he spent his career building accounts receivable systems. A lawyer sees excessive fines. A self-educated accounting auditor who built A/R software for the original personal computers sees a municipal government running a collections operation disguised as code enforcement.

12. The City of Cincinnati did not invent this scheme. On December 27, 2010, Appellant read and clipped a Wall Street Journal article documenting how municipalities across the country, facing fiscal crises after the 2008 recession, were turning code enforcement into non-tax revenue. The Institute for Justice later documented cities generating 14–25% of total municipal revenue from fines and fees. The DOJ's Ferguson investigation exposed the extreme: 90,000 citations in four years for a city of 21,000 people. Cincinnati read the blueprint and built the machine. The VBML program, which generates $9 million annually and has been described inside City government as a "money printing machine," is the machine taken to its logical conclusion.

### A. The Pre-2013 System Worked — And Was Replaced Because It Did

13. Before 2013, Litter Patrol operated on a simple, constitutional premise: warn first, fine only if ignored. Inspector Francis Fortney (spelling approximate) was the Sedamsville litter patrol officer. He mailed warnings. Property owners had 72 hours to comply. No hearing fees. No automatic doubling. No tax liens. The system worked. In a Cincinnati hearing involving Lot King LLC, evidence established that 85% of all warning tickets were cured voluntarily within the remedy period.

14. The City apparently viewed 85% voluntary compliance as a problem—because the litter patrol department was a net financial loser. A system where 85% of people fix their problems for free does not generate accounts receivable. In approximately 2013, the City overhauled the ordinance: eliminated the 72-hour warning, imposed $250–$500+ initial fines, added automatic doubling without hearing, systematized tax lien placement, and added mandatory hearing fees in 2018. Post-2013, inspectors received new vehicles and mobile computers that generate and transmit citations in real time. You do not invest in new vehicles, mobile computers, and automated systems for a department that is losing money unless you intend for that department to start making money. The good-faith inspector who once mailed a warning became the enemy driving a new City vehicle.

### B. The Millions Paid by Those Who Knew Better but Couldn't Afford to Fight

15. Appellant brings this action not only for himself but for every landlord in Cincinnati who received a $500 fine for an overflowing trash can, knew it was a shakedown, paid it anyway, and said what every Cincinnati landlord has said: "Pay the bullshit fine and move on." They made a rational economic calculation: fighting costs more than surrendering.

The City calibrated the system precisely to produce that calculation. The hearing fee alone—paid even by those who prevail—is designed to discourage resistance. The automatic doubling creates urgency: pay now or it doubles. These people were extorted. They just couldn't afford to prove it.

## III. MOTION FOR LEAVE TO PURSUE CLASS ACTION

### A. The Legal Foundation: Compound Property Management

16.  In *Compound Property Management LLC v. Build Realty, Inc.*, Case No. 1:19-cv-133 (S.D. Ohio), Judge Douglas R. Cole certified a RICO class action on behalf of property investors victimized by a coordinated scheme involving real estate entities, title companies, and associated individuals. The court granted certification, appointed class counsel, and the case settled for $1.3 million. Appellant's case presents a stronger basis for certification: the scheme is conducted by governmental actors under color of law; predicate acts are documented in municipal ordinances, automated enforcement systems, and HCLRC board minutes; the pattern spans over a decade; and the class potentially encompasses thousands of property owners citywide.

17.  The district court dismissed this case without reaching the merits, without permitting discovery, and without any opportunity for class certification. Appellant requests leave to pursue class claims and remand with instructions to consider class certification upon a proper record—or, alternatively, that this Court note the class claims in its mandate so they are not waived upon remand.

### B. The Three-Entity Structure of the Enterprise

18. The enterprise operates through three indispensable entities: (1) The City of Cincinnati creates the financial instruments—fines, doublings, liens, accounts receivable; (2) Hamilton County converts those instruments into property seizures through its tax foreclosure machinery; and (3) HCLRC acquires the seized properties for nominal consideration. Remove any one, and the pipeline breaks. Hamilton County must be added as a class action defendant: its foreclosure machinery is the conversion mechanism that makes every other step in the pipeline enforceable.

## C. Five Proposed Classes

19. Appellant seeks leave to pursue class claims on behalf of the following classes:

**Class 1: The Disproportionate Fine Class**

All persons assessed property maintenance fines by the City of Cincinnati exceeding $100 for violations posing no threat to public safety, where the fine was automatically doubled without a prior hearing. Class Period: July 1, 2018 to present.

**Class 2: The Landlord-Liability Class**

All rental property owners assessed fines for violations caused by tenants' conduct, where the landlord had no notice or opportunity to cure before the fine was imposed. Class Period: July 1, 2018 to present.

**Class 3: The VBML Extortion Class**

All persons assessed Vacant Building Maintenance License fees where: (a) the vacancy was created by the City's own enforcement actions; (b) fees were assessed for properties that were not vacant—as documented in Case No. B202601272, $3,640.00, issued February 10, 2026, four months after the City's own inspector physically cleared the occupied building with a witness present, on a property whose habitability had been confirmed by GEI Engineering, inspected by Mr. Finn.  Inspector Rhodes presented  testimony at a formal public nuisance hearing whose findings Rhodes then buried; and/or (c) VBML insurance requirements were impossible to satisfy. Class Period: program inception to present.

**Class 4: The Hearing Fee Class**

All persons who paid mandatory fees to the Office of Administrative Hearings to contest municipal citations since July 1, 2018, including those who prevailed and still paid. Class Period: July 1, 2018 to present.

**Class 5: The Fee-to-Foreclosure Pipeline Class**

All persons who lost real property  ( numbered at over 1500) through 1. Hamilton County tax foreclosure where the City appeared as a creditor based on accumulated fines, fees, and liens, and where the property was subsequently transferred to HCLRC or another governmental entity. 2. Surrender  the property or face huge accumulated fines  or even jail time.  Claims against both the City of Cincinnati and Hamilton County. Class Period: 2013 to present.

**D. Why This Case Has Never Been Brought Before — And Why Appellant Is Adequate**

20.  No property owner has previously brought a civil RICO class action against a major American city for operating its code enforcement system as a racketeering enterprise. The reason is not that the scheme is invisible. It is that the specific combination of skills required to see it does not exist twice. It required someone who built accounts receivable software and recognized the fines pipeline as a structured A/R operation. It required someone who owned enough properties to see the pattern across dozens of addresses. It required forensic accounting experience—following receipts to bank deposits, identifying where money disappeared. It required five years of FBI cooperation that produced federal convictions and guilty pleas. And it required someone stubborn enough to keep fighting after losing everything—his wife, his properties, his income, and very nearly his home.

21.  Appellant operated a grocery store, an ice cream shop, and a pizza carry out in Sedamsville. He holds three patents pending, including his MyJon waterless toilet system under NDA with a major manufacturer. He rehabilitated 20 historic properties under his personal motto: "If I wouldn't live here, then you can't." He served as Charter President of both the Sedamsville Historical Society and the St. Anne's Hill Historical Society. He personally counseled nine African-American property owners—whose land was seized through the identical condemn-bill-foreclose pipeline to build the FC Cincinnati Soccer Stadium and the MLK/I-71 interchange—advising them how to fight back. They are fighting back. They are winning.

**22.  For thirty-five years, Appellant's answer to those who questioned why he invested in abandoned buildings was: "If I won't save them, who will?" That same principle drives this action: If I don't stop this fraud on the lawyerless people of Cincinnati, who will?**

**E. Rule 23 Requirements and Phased Certification**

**23.  Numerosity: The VBML program alone generates $9 million annually. The litter control program and OAH hearing fee policy each affect thousands more. Joinder is impracticable. Commonality: Whether the City's systematic use of disproportionate fines, automatic doubling, tax lien placement, and accounts receivable bookkeeping constitutes a RICO enterprise is common to all class members. Typicality: Appellant was subjected to the identical pipeline—selective enforcement, disproportionate fines, automatic doubling, VBML fees for a City-created vacancy, VBML fees for an occupied building cleared by the City's own inspector, a buried public nuisance hearing, tax lien placement, and foreclosure with the City appearing as a creditor. Adequacy: As detailed above, Appellant's combination of A/R software expertise, forensic accounting experience, FBI cooperation, and personal experience across 59 properties makes him uniquely qualified.**

**24.  Phased Certification: Classes 1 and 4 should be certified first—their membership is determinable from the City's own electronic records. The City's automated citation system recorded every fine issued, every doubling, and every lien placed. The system that created the problem also created the evidence. Discovery from Classes 1 and 4 will produce the City's CAFR accounts receivable data that is the evidentiary foundation for all remaining classes. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 617 (1997).**

**IV. CRITICAL DISCOVERY — ORDERED PRESERVED**

**25.  Upon remand, Appellant will seek the following discovery, which this Court should order preserved immediately:**

(a)  **CAFRs from 2013 to present** — accounts receivable schedules showing the total dollar value of fines and fees booked as municipal assets. Appellant believes this figure is in the tens of millions of dollars.

(b)  **Automated citation system documentation** — programming specifications, algorithms, criteria for citation generation, and procedures (if any) for human review before fines are issued and doubled.

(c)  **The complete record of the 621 Delhi public nuisance hearing**, including Inspector Rhodes's pre-hearing inspection notes confirming the temporary stabilization was adequate and he was not in danger anywhere he walked; all evidence submitted including the GEI Engineering report; and a full written explanation from Inspector Rhodes of why no written finding or report was ever issued following a formal hearing at which three witnesses presented sworn evidence.

(d)  **VBML records for Case No. B202601272 (623 Delhi) and Case No. B202006417 (621 Delhi)**, including Inspector Finn's October 8, 2025 inspection records and all records showing when and by whom the building's status was updated—or not updated—in the City's database.

(e)  **Hamilton County foreclosure records** — all tax foreclosure proceedings from 2013 to present in which the City appeared as a creditor based on accumulated fines and fees, and all properties transferred to HCLRC through such proceedings.

(f) **The Jacqueline Martin foreclosure statement, did not include the $100,000+ billing for the alleged demolition of the 637 Steiner Avenue church that was never demolished but I received a bill;; all CDBG grant drawdown records and proof-of-completion documentation for both the phantom demolition and the subsequent authorized $200,000 stabilization by the Cincinnati Preservation Society who controlled the church at 637 Steiner ; and over $10,000 in Boydston billings prior to the receivership even commencing that Martin approved or failed to audit.**

(g) **The 5615 Sidney Road claim documentation — specific fines at issue, the address where each violation actually occurred, the legal authority for placing investment-property fines on a personal residence where no violation occurred, and evidence of whether any fine was double-billed.**

## V. CONSTITUTIONAL VIOLATIONS

26. **Excessive Fines (Eighth Amendment /** *Timbs***): A $500 fine for uncut grass that doubles, becomes a lien, accrues interest, and ultimately costs a family their home is grossly disproportionate. The government may not impose a fine that, in its cumulative effect, constitutes forfeiture of property worth orders of magnitude more than the violation.**

27. **Due Process (Fourteenth Amendment): Automatic doubling without hearing; VBML invoices for occupied buildings without any occupancy verification; mandatory hearing fees to access the sole adjudicative mechanism; and—most critically—a formal public nuisance hearing at which sworn evidence was presented, followed by no written finding whatsoever,**

denying the property owner any decision to appeal. *Mathews v. Eldridge*, 424 U.S. 319 (1976).

28. **Takings (Fifth Amendment):** The cumulative effect of selective enforcement, automatic doubling, and tax lien conversion results in property seizure without just compensation. *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595 (2013).

29. **Equal Protection (Fourteenth Amendment):** Selective enforcement targeting Appellant's properties while refusing to conduct neutral area-wide sweeps, coordinated with HCLRC's board-directed acquisition goals, establishes a class-of-one violation. *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000).

30. **Hobbs Act Extortion — The $3,640 VBML Demand (18 U.S.C. § 1951):** Every element of Hobbs Act extortion under color of official right is present in Case No. B202601272. Inspector Rhodes is a government official. The City demands $3,640—property. The demand is made under the color of Rhodes's official authority. What makes this Hobbs Act extortion rather than mere error is knowledge: Inspector Finn personally inspected 623 Delhi unit #2 and confirmed  proper occupancy. Rhodes personally walked  621 Delhi and inspected the temporary stabilization.  It was adequate. He attended the formal public nuisance hearing the next day where three witnesses presented sworn evidence of habitability. He issued no report. He then—four months after his own colleague Inspector Finn physically cleared an  occupied apartment at 623 Delhi unit # 2 with maintenance man Richard Harris—allowed his office to issue a $3,640 invoice under threat of civil judgment, automatic doubling, and a property lien. That is not an administrative error. That is a knowing demand for money backed by governmental power, made by an official who is fully aware that no factual or legal basis for the demand exists.

Under RICO, 18 U.S.C. § 1964(c), Appellant seeks treble damages on the $3,640.00 extortionate demand: $10,920.00, plus costs. *McCormick v. United States*, 500 U.S. 257 (1991).

31.  **The Broader Hobbs Act Pattern:** The $3,640 demand is the third Hobbs Act predicate act at 621/623 Delhi alone. First: $15,015 VBML for a City-created vacancy after GEI confirmed habitability. Second: $750 citation that the signing inspector agreed was his mistake. Third: $3,640 VBML for an occupied building cleared by the City's own inspector, issued by an inspector who personally confirmed habitability. Three predicate acts. One address. The RICO pattern is not alleged—it is documented.

## VI. THE FRAUDULENT FORECLOSURE STATEMENT AND FEDERAL GRANT FRAUD

32.  **Among the charges assembled by former City official Jacqueline Martin did not place on Appellant's foreclosure ledger was a bill for over $100,000 klosterman received for the alleged demolition of the church at 637 Steiner Avenue. The church was not demolished. CDBG funds were apparently drawn down from the federal government for a demolition that never occurred. Years later, the Cincinnati Preservation Society—which held 100% control of the property under Appellant's signed contract—had the City perform stabilization work using CDBG funds again, without Appellant's knowledge or consent. CDBG funds were drawn down at least twice on the same property: once for a demolition that never happened, and again for stabilization work that Appellant had no involvement in and no knowledge of until he received the bill in 2019. The stabilization charge was then placed on Appellant's personal foreclosure ledger despite his having signed away all rights to the property.**

33.  Martin also approved—or failed to audit—over $10,000 in Receiver Boydston's billings that were submitted prior to the receivership even commencing. This is not administrative sloppiness. This is the fingerprint of the enterprise: inflate the receivership expenses before the receivership begins, bury the evidence in a foreclosure statement, and hope no one with forensic accounting experience ever reads it. Appellant read it. Appellant has the receipts.

## VII. RELIEF REQUESTED

Appellant respectfully requests that this Court:

Emergency Injunctive Relief:

A.  ENJOIN the City of Cincinnati from imposing any further fines, fees, citations, or VBML assessments against 621/623 Delhi Avenue pending resolution of this appeal, specifically including: (i) VBML Case No. B202006417 ($15,015.00); (ii) VBML Case No. B202601272 ($3,640.00)—issued February 10, 2026, four months after the City's own inspector cleared the occupied building with witness Richard Harris present.  Inspector Rhodes personally walked and confirmed temporary stabilization was adequate and  at a formal public nuisance hearing whose findings were then buried; and (iii) Citation Notice B202505918 ($750.00) pending March 23, 2026—issued by an inspector who agreed it was his own mistake;

B.  ENJOIN the Hamilton County tax foreclosure of 5615 Sidney Road (Case No. A2505484) pending resolution of this appeal, including the City of Cincinnati's claim based on accumulated fines generated by the RICO enterprise and placed on a residence where no violation occurred;

**C.  ORDER the City of Cincinnati to identify and segregate all fines supposed to have been resolved in the receivership proceedings;**

**Mandatory Disclosure — The Buried Public Nuisance Hearing:**

**D.  This Court is respectfully requested to ORDER Inspector Kevin Rhodes and the City of Cincinnati to produce, within fourteen (14) days of this Court's order, the following:**

    **(i)   The complete verbatim transcript or audio/video recording of the 621 Delhi Avenue public nuisance hearing held approximately one year prior to this filing, including all evidence submitted, all testimony given, and all statements made by Inspector Rhodes or any other City representative at that hearing;**

    **(ii)  Inspector Rhodes's complete pre-hearing inspection notes and any written report generated from his personal walk-through of the building unit at 621 Delhi Avenue, including his specific findings that: the temporary stabilization already in place was adequate; and that he was not in danger anywhere he walked in the building;**

    **(iii) The GEI Engineering structural report as entered into evidence at the hearing, confirming that the living quarters at both 621 and 623 Delhi Avenue were sound and habitable even years after the report was issued ;**

    **(iv)  Randy Hatfield's sworn affidavit as submitted at the hearing;**

    **(v)   Mike Avery's sworn affidavit as submitted at the hearing;**

(vi)  All internal City communications between the hearing date and the date of this filing regarding 621 Delhi Avenue, including any communications between Inspector Rhodes, his supervisors, the City Solicitor's office, or any other City official regarding the hearing outcome, the VBML billing, or this federal RICO appeal;

(vii) A sworn written explanation, signed by Inspector Kevin Rhodes personally under penalty of perjury, stating: (a) why no written report, finding, or ruling was ever issued following a formal public nuisance hearing at which sworn evidence was presented by three witnesses; (b) who, if anyone, directed Rhodes not to issue a written finding; (c) whether Rhodes was aware at the time he signed the February 10, 2026 VBML invoice (Case No. B202601272) that his own inspector had cleared the building four months earlier; and (d) whether Rhodes was aware at that time that this property was the subject of a pending federal RICO appeal.


The law is unambiguous: a property owner who appears at a formal administrative hearing, presents sworn evidence, and requests a ruling is entitled to a written decision. The absence of a written ruling from that hearing is not a procedural technicality. It is a deliberate act that denied Appellant the ability to appeal the hearing outcome, contest the VBML fees that followed, or seek judicial review of findings that—based on three sworn witnesses and a structural engineer's report—would have vindicated his position entirely. Silence was not an option the law permitted Inspector Rhodes. It was a choice he made. This Court has the authority and the obligation to require him to explain that choice under oath.

**Class Action Relief:**

**E. GRANT** leave to pursue class action claims on behalf of all five proposed classes against both the City of Cincinnati and Hamilton County, Ohio, modeled on *Compound Property Management LLC v. Build Realty, Inc.*, Case No. 1:19-cv-133 (S.D. Ohio);

**F.** Upon remand, **ORDER** appointment of qualified class counsel with RICO class action experience preferable outside of the City of Cincinnati;

**Discovery — Ordered Preserved:**

**G. ORDER** immediate preservation of all City CAFRs, accounts receivable schedules, automated citation system documentation, VBML records, HCLRC coordination records, the 637 Steiner Avenue CDBG grant documentation, the Jacqueline Martin foreclosure statement records;

**Appellate and Damages Relief:**

**H. REVERSE** the district court's dismissal and **REMAND** with instructions to permit full discovery;

**I. REASSIGN** to a different district judge under 28 U.S.C. § 2106;

**J. AWARD** RICO treble damages under 18 U.S.C. § 1964(c), including treble damages on the $3,640.00 Hobbs Act extortion demand in VBML Case No. B202601272—$10,920.00 plus costs—made by an official that should have had personal knowledge that the building was occupied and habitable.

**K.  Upon remand, ORDER an independent audit of the Jacqueline Martin foreclosure statement, including the phantom 637 Steiner Avenue demolition bill and all pre-receivership Boydston billings, and AWARD treble damages on all fraudulently billed amounts;**

**L.  Upon remand, ORDER the City to identify and refund all double-billed fines placed on both investment properties and 5615 Sidney Road, and AWARD treble damages on all double-billed amounts;**

**M.  ADD Jacqueline Martin personally as a defendant and ADD Hamilton County as a defendant;**

**N.  GRANT such other relief as this Court deems just and proper.**

**CONCLUSION**

Senator Howard Baker's question brought down a presidency: "What did the President know, and when did he know it?" The Watergate cover-up did not fail because the break-in was discovered. It failed because the cover-up itself became the crime. The tapes were not destroyed in time. The silence spoke louder than any testimony. The institution that tried to bury the evidence found that the burial itself was the confession.

Inspector Kevin Rhodes attended a formal public nuisance hearing at 621 Delhi Avenue. He personally walked the building unit before that hearing and stated the temporary stabilization was adequate—that he was not in danger anywhere he walked. At the hearing, a structural engineer's report confirmed the living quarters at both 621 and 623 Delhi Avenue were sound

and habitable. Randy Hatfield appeared under oath. Mike Avery appeared under oath. Three witnesses. Sworn evidence. A professional engineer's report. Rhodes heard all of it.

He issued no report. He issued no finding. He issued no ruling. He issued nothing. And then—months later—his office issued a $15,000.00 VBML invoice for the same building, then four months after his own inspector had inspected inside 623 Delhi # 2 the occupied apartment and cleared it with no problems. Then a $3,600. 00 VBML bill is received by Appellant. He issued it while this federal RICO appeal was pending before this Court. The cover-up is not alleged. It is documented in the absence of paper where paper was legally required.

What did Inspector Rhodes know, and when did he know it? He knew the 621 building was habitable because he walked it. He knew the sworn evidence at the hearing destroyed the City's legal position. He knew that a written finding—the finding the law required him to produce—would create an appealable order that Appellant could contest and almost certainly win on 621 Delhi. He chose silence over the law. The Watergate tapes were not erased in time. Inspector Rhodes's tapes are the hearing record, the inspection notes, and the February 10, 2026 invoice—all sitting in the City's own files, waiting for this Court's order to produce them. And now 623 is deemed vacant. What else can happen?

In *On the Waterfront*, the waterfront boss Johnny Friendly told Terry Malloy: "You'll never work the docks again." The message to Appellant has been the same for five years: you will never recover your properties, you will lose your home, and you will go away. The strategy is

protection of the enterprise at the expense of the individual—the oldest play in the playbook. Protect the family. Keep it quiet. The old man will go away.

Terry Malloy didn't go away. He walked into the hearing room and told the truth. He paid for it every day afterward. He did it anyway because someone had to. John Klosterman has been paying for telling the truth for five years. He told the FBI in April 2020. He cooperated through criminal trials and guilty pleas. He watched Joseph Lentine receive 63 months. He watched HCLRC admit in sworn court filings that it knew about systematic theft of $423,169. The nine African-American families whose land was seized through this identical condemn-bill-foreclose pipeline to build a soccer stadium and a highway interchange. They are fighting. They are winning.

This Court is now presented with the complete picture: a machine that converts disproportionate fines into financial instruments, financial instruments into tax liens, tax liens into foreclosures, and foreclosures into government property—operating through three interlocking entities, running on automated software that generates invoices faster than any inspector can review them, protected by a culture of silence in which formal hearings produce no written findings, $3,640 invoices are issued for occupied buildings cleared by the City's own inspectors, and a 76-year-old man who spent 35 years rebuilding a Cincinnati's historic neighborhood finds the City of Cincinnati listed as a creditor in the foreclosure of his home.

The same City whose co-conspirators stole his income. The same City whose inspector buried the public nuisance hearing findings. The same City whose automated machine issued a

$3,640 invoice for an occupied building four months after its own inspector said "all ok"—on a property whose habitability had been confirmed by a structural engineer, walked personally by the inspector who signed the bill, and presented in sworn testimony at a formal hearing whose findings that inspector chose to suppress..

A regular man—any working family in Cincinnati—confronted with this machine has no path. The fine is too small to hire a lawyer to fight. The doubling creates urgency to pay. The hearing fee punishes those who try to contest. The tax lien accumulates while they work. The foreclosure arrives when they cannot keep up. And the City appears at the auction to collect on the fines that started the whole process. That is not code enforcement. That is a taking. And this Court has the power to stop it.

The machine is still running. This Court has before it the evidence, the authority, and the obligation to stop it. The question is the same one that has been asked of every institution confronted with documented wrongdoing since Watergate.

Respectfully submitted,

John Klosterman
5615 Sidney Road
Cincinnati, Ohio 45238
Pro Se Plaintiff-Appellant

**CERTIFICATE OF SERVICE**

I hereby certify that on February __19__, 2026, I filed this Motion with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit via the CM/ECF system, which will send notification to all counsel of record.


**John Klosterman**