RECEIVED
FEB 19 2026
KELLY L. STEPHENS, Clerk

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**JOHN KLOSTERMAN,**
    Plaintiff-Appellant,

v.                                             Case No. 26-3118

**KONZA, LLC, et al.,**
    Defendants-Appellees.

---

## APPELLANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT
## ON LIABILITY BASED ON DEFENDANTS' OWN ADMISSIONS

## I. INTRODUCTION

1. Appellant John Klosterman moves this Court for partial summary judgment on the issue of liability, or in the alternative, for an order reversing the district court's dismissal and remanding with instructions to grant partial summary judgment. This motion is based entirely on Defendants' own sworn admissions, judicial filings, and criminal convictions—not contested facts, not circumstantial evidence, and not Appellant's characterizations. *The co-conspirators have confessed.* The question is no longer whether fraud occurred. The only question is damages.

2. The district court dismissed this case on December 10, 2025 without reaching the merits, without permitting discovery, and three days before HCLRC filed admissions confirming the theft. The dismissal was premature. The evidence that has emerged since—from the Defendants themselves—establishes liability as a matter of law.

## II. DEFENDANTS' OWN WORDS: VERBATIM SWORN TESTIMONY AND JUDICIAL ADMISSIONS

The following are not allegations. They are not characterizations. They are the Defendants' own words, under oath and in court filings, establishing every element of fraud and RICO violations as a matter of law.

### A. Richard Boydston's Sworn Testimony: The "Engineered Sale" Confession

3. At the January 8-12, 2025 bench trial in Hamilton County Case No. A1905588, Defendant Richard Boydston—the court-appointed Receiver and Manager of Konza, LLC—testified under oath. The following exchanges are verbatim from the trial transcript:

> *Q: "How was the purchase price of $1,474,017.00 calculated? It includes any part of the operating deficit that Tri-State had been reporting through the receiver's 30th report?"*
>
> *A: "...it was my hope that everybody could be covered by that."*
>
> *Q: "Was this purchase price the value of the properties, or was this calculated to satisfy the expenses of the receivership?"*

> A: *"It was hoped that that would cover the expenses of the receivership with agreed reductions...that was my belief at the time."*

4. Boydston further testified about the negotiation process:

> *"The negotiation that resulted in the September 26th motion was in anticipation of a haircut for Konza, and a haircut for TSO."*

5. Joseph Lentine, the property manager, testified explicitly about the nature of the transaction:

> *"This was an engineered sale."*

6. **Analysis:** These admissions are devastating. The Receiver admitted under oath that the sale price was *not based on property value* but was "calculated to satisfy the expenses of the receivership." This inverts the entire purpose of a court-ordered sale. A fiduciary's duty is to maximize value for the estate—not to engineer a price that pays his own fees. Boydston's confession establishes fraud as a matter of law.

### B. "Klosterman Gets Zero": The Deliberate Elimination of the Property Owner

7. In his motion asking the court to overrule Klosterman's objection to pay Konza and Boydston their fees, Boydston made the following extraordinary admission:

3

> *"Klosterman has no pecuniary interest or claims to any funds paid or payable by the land bank to purchase the properties from the receiver. The only persons with any interest in those funds are the land bank, the receiver and TSO. There is no possible way Klosterman could be entitled to receive any proceeds of the sale."*

8. Boydston then revealed the mechanism by which the property owner was eliminated:

> *"The purchase and sales agreement approved by the court by order entered March the 4th 2022 expressly provides that in the event there is cash left over payment of the receivership fees and expenses, the title company acting as escrow agent is to pay the remaining balance back to the land bank."*

9. Lentine confirmed this scheme in his testimony.

10. Analysis: Read that again: *excess funds go back to the buyer, not the property owner.* This extraordinary provision—returning leftover proceeds to HCLRC rather than Klosterman—confirms the fraudulent intent. The sale was structured so that the Receiver gets paid, the property manager gets paid, the land bank gets any surplus—and the property owner gets zero. This is not a receivership. This is theft by court order.

C. Rigged Bidding: Only HCLRC Allowed Inside the Properties

4

**11. Lentine testified that potential bidders were deliberately excluded from inspecting the properties—except for HCLRC:**

> *"Hamilton County Land Bank was given all sorts of special treatment... Lentine was asked to walk around and allow people into buildings that were occupied... Lentine told no entry that's per the conditions but the land bank was allowed to enter."*

**12. Analysis: This admission is fatal to any claim of a legitimate auction. If a bidder cannot inspect the interior of a property—cannot see the wiring, the furnace, the kitchen, the plumbing—a rational bidder will bid as though *everything* must be replaced. This artificially suppresses all bids except from the one party given "special treatment": HCLRC. The preferential access created an information asymmetry that eliminated any possibility of competitive bidding. This was not an auction. This was a predetermined transfer to a predetermined buyer.**

**D. Systematic Property Destruction: From "B" Grade to Ruins**

**13. Before the receivership, Appellant's properties were rated "B" grade—solid, habitable structures generating rental income. The Receiver delegated all property management to Joseph Lentine, a three-time convicted felon, despite knowing Lentine's criminal history. Boydston's own billing records show he researched Lentine on March 6, 2020 and discovered:**

5

- Tri-State Organization Inc., a Connecticut corporation, was not in good standing;

- Joseph Lentine had a pending felony for passing bad checks;

- Joseph Lentine had a previous federal felony resulting in ten years incarceration.

**14.** Despite this knowledge, Boydston delegated receivership responsibilities to Lentine *without a written contract* and without implementing any enhanced controls. QuickBooks was there to be used. Lentine then staffed the properties with unqualified workers—described in testimony as homeless individuals—who systematically destroyed the buildings through neglect, vandalism, and incompetence.

**15.** Fires alone caused over $350,000 in damages to the receivership properties. Properties that were generating rental income when the receivership began were rendered uninhabitable. The systematic destruction served the conspiracy's purpose: it justified the artificially low "engineered" sale price to HCLRC.

**16. Analysis:** A receiver's fiduciary duty is to *preserve and protect* estate assets. Instead, Boydston delegated control to a known felon, permitted that felon to retain $423,169.42 in rents without accounting, and watched as the properties were systematically destroyed. The destruction was not negligence—it was the mechanism by which $3.5 million in real estate was converted to $800,000 for a predetermined buyer.

**E. HCLRC's December 8, 2025 Filing: The Smoking Gun**

6

**17.** On December 8, 2025—*two days before* the district court dismissed this case—the Hamilton County Land Reutilization Corporation filed a motion in Case No. A1905588 containing the following verbatim admissions:

**ADMISSION #1 — Knowledge of Systematic Theft:**

> *"The Court found that, while they acted as property managers, Lentine and TSO collected and kept all rents due for the Properties—amounting to $423,169.42."*

(HCLRC Motion, p. 6)

**ADMISSION #2 — Recordkeeping "Intentionally Designed to Conceal":**

> *"[T]he Receiver's recordkeeping was woefully deficient...intentionally designed to conceal."*

(HCLRC Motion, p. 4)

**ADMISSION #3 — Pre-Negotiated Purchase Agreement:**

> *"The sale agreement also allocated funds for 'all costs expenses and fees, as approved by the Court, payable to or for the benefit of' the Receiver."*

(HCLRC Motion, p. 5)

**ADMISSION #4 — "Entangled" in Fraud:**

> *"The Receiver's practices already entangled HCLRC in unnecessary litigation, and HCLRC has already incurred its own substantial legal fees as a result."*

(HCLRC Motion, p. 4)

ADMISSION #5 — No Competitive Auction:

*"HCLRC and the Receiver finalized the sale of the Properties on May 1, 2023."*

(HCLRC Motion, p. 5)

18. Analysis: Note the language: "HCLRC and the Receiver *finalized the sale*"—not "HCLRC won at auction" or "HCLRC was the highest bidder." This language confirms a pre-arranged transaction between co-conspirators, not a competitive public auction. The admission that funds were "allocated" for the Receiver's benefit proves the sale price was reverse-engineered to pay predetermined parties—exactly as Boydston confessed.

F. Boydston's January 12, 2026 Filing: The Conspiracy Timeline Revealed

19. On January 12, 2026—while fighting with HCLRC over money—Receiver Boydston filed a memorandum that revealed the full scope of the conspiracy. The following are verbatim quotes:

ADMISSION #6 — Planning "Since 2021":

*"Since 2021, The Port has worked alongside the City of Cincinnati and the Hamilton County Landbank to acquire and stabilize local housing stock, laying the foundation for increased homeownership. Together, they purchased*

8

> *a 65-property portfolio out of receivership, 23 structures, 41 vacant lots, and one parking lot, for strategic redevelopment."*
>
> (Boydston Memo at 5, quoting HCLRC's own RFP)

20. **Analysis:** The receivership was filed in February 2020. HCLRC's own document states planning began "since 2021." Note the language: "*Together, they purchased*"—not "HCLRC won at public auction." The enterprise coordinated the outcome before any auction occurred.

**ADMISSION #7** — October 2022 Board Minutes: "Are Being Purchased":

> *"Philip Denning...told the HCLRC Board that: 'the Landbank executed a funding agreement with the City for the Sedamsville portfolio acquisition. There are 39 vacant land parcels, and 23 homes are being purchased out of receivership.'"*
>
> (Boydston Memo at 5-6)

21. **Analysis:** This statement was made in October 2022—seven months before the May 2023 closing. Note the verb tense: "*are being purchased*" (present continuous)—not "may be purchased" or "will be auctioned." The outcome was predetermined. There was no auction. There was an "engineered sale" to a predetermined buyer at a predetermined price.

**ADMISSION #8** — "Intimately and Crucially Involved" Since Early 2022:

> *"HCLRC has been actively involved in this case since early 2022 and formally replaced the City as plaintiff in October 2023."*

9

(Boydston Memo at 15)

*"HCLRC has been intimately and crucially involved in this case, including...in monitoring the Receiver's monthly reports."*

(Boydston Memo at 21)

22. Analysis: HCLRC was "intimately involved" with the Receiver for 14 months before purchasing (early 2022 to May 2023). This destroys any claim that HCLRC was an innocent arms-length buyer. A legitimate auction purchaser does not "monitor" the receiver's reports for over a year before "winning" an auction.

ADMISSION #9 — $400,000+ Tax Evasion:

*"HCLRC also took advantage of the Ohio statute that exempts landbanks...from paying real estate taxes...The amount of those taxes is estimated by the Receiver to have been over $400,000."*

(Boydston Memo at 7)

ADMISSION #10 — Undisclosed Funding Sources:

*"Who paid how much of the $800,000 has not been disclosed...It could have been a combination of federal COVID era federal funding, State of Ohio funding, Hamilton County funding, and City funding."*

(Boydston Memo at 6-7, 18)

10

23. Analysis: Even the Receiver does not know where the $800,000 came from. Boydston speculates it included "federal COVID era federal funding." If federal funds were used to finance a fraudulent acquisition, that constitutes federal program fraud under 18 U.S.C. § 666.

G. Six Federal Criminal Convictions: The Enterprise Is Proven

24. Six individuals have been convicted in federal court for crimes connected to the conspiracy against Appellant:

- Joseph Lentine — 63 months federal prison (wire fraud conspiracy)
- Angel Strunk — 5 years probation (pled guilty February 5, 2026)
- Four additional co-conspirators convicted in the PPP fraud scheme

25. Appellant has served as an FBI cooperating witness since 2020. His whistleblowing directly contributed to these federal convictions.

26. Under *Emich Motors Corp. v. General Motors Corp.*, 340 U.S. 558, 569 (1951), a criminal conviction is conclusive in a subsequent civil proceeding as to the facts necessarily decided in those proceedings. Lentine's conviction for wire fraud conspiracy involving the receivership properties establishes the criminal enterprise as a matter of law.

H. The $25,000 Bribe: Witness Tampering Under 18 U.S.C. § 1512

11

27. Jennifer Donathan of Keller Williams—acting as Boydston's agent—offered Joseph Lentine $25,000 to sign a non-disclosure agreement and "go away." Lentine refused. He testified. He confirmed the "engineered sale." He obtained a $57,271.18 judgment against Boydston—which Boydston refuses to pay.

28. The attempt to pay a witness $25,000 to remain silent constitutes witness tampering under 18 U.S.C. § 1512(b)(3) and is an additional RICO predicate act. Consciousness of guilt could not be more clear.

## III. LEGAL STANDARD: THE PEOPLE v. TRUMP FRAMEWORK

29. In *People v. Trump*, No. 452564/2022 (N.Y. Sup. Ct. 2023), Judge Arthur Engoron granted partial summary judgment establishing fraud as a matter of law where the documentary evidence was overwhelming and the defendants' own statements contradicted their defenses.

30. The same standard applies here. The Defendants' own admissions—"engineered sale," "calculated to satisfy the expenses of the receivership," "intentionally designed to conceal," "intimately and crucially involved" "since 2021," and "Klosterman has no pecuniary interest...no possible way Klosterman could be entitled to receive any proceeds"—eliminate any genuine dispute of material fact. Like *Trump*, the only remaining questions are damages and the scope of additional claims.

31. As in *United States v. Nixon*, 418 U.S. 683 (1974), the tapes told the story. Here, Boydston's billing records, HCLRC's Board minutes, and the Defendants' own sworn statements are the equivalent of the Nixon tapes—contemporaneous documentary evidence that proves the conspiracy in the conspirators' own words.

## IV. DAMAGES FRAMEWORK

32. Upon a finding of liability, the following damages categories should proceed to discovery and trial:

> a. Property value destruction: $3.5 million in properties sold for approximately $800,000—a loss of $2.7 million, trebled under RICO to $8.1 million;

> b. Stolen rental income: $423,169.42 collected and kept without authorization or infusing the funds into upgrading the estate, trebled to $1,269,508;

> c. Fraudulent receiver fees: $499,717.76 paid from estate funds on fraudulent billings where at minimum 65% were unrelated to the recievership, including $10,000+ for pre-appointment work and $210,854 billed through unlicensed entity Konza LLC;

> d. Fire damages: Over $350,000 in property destruction caused by Lentine's and KonzaLLC / Boydston's mismanagement;

13

e. Consequential damages: Five years of litigation time cost in preparation by Pro Se, tax foreclosure of Appellant's personal residence caused by the fraud;

f. Punitive damages: The egregious nature of the conduct—theft by court-appointed officers, six federal convictions, attempted witness tampering, deliberate exclusion of the property owner from any recovery—warrants substantial punitive damages.

## V. RELIEF REQUESTED

Appellant respectfully requests that this Court:

A. REVERSE the district court's dismissal and REMAND with instructions to grant partial summary judgment establishing liability for fraud, breach of fiduciary duty, and RICO violations based on Defendants' own admissions;

B. ORDER that the only issue for trial is the calculation of damages;

C. ORDER the appointment of a mediator for Defendants who wish to settle before trial;

D. ORDER the assignment of a new district judge on remand, given that Judge Dlott dismissed the case without considering the devastating admissions;

E. ORDER expedited discovery on the scope of damages;

F. ORDER that Defendants preserve all documents and communications;

G. GRANT such other relief as this Court deems just and proper.

## VI. CONCLUSION

The co-conspirators have confessed.

14

The property manager is serving 63 months in federal prison. The Receiver testified under oath that the sale was "engineered" and "calculated to satisfy the expenses of the receivership." He stated in court filings that "Klosterman has no pecuniary interest" and there is "no possible way Klosterman could be entitled to receive any proceeds." The land bank's own attorney described recordkeeping "intentionally designed to conceal." Board minutes from October 2022—seven months before the sale—state that "23 homes *are being purchased*" (not "will be auctioned"). The land bank has been "intimately and crucially involved" "since 2021." Only HCLRC was allowed to enter the properties—other bidders were told "no entry." The real estate agent tried to buy a witness's silence for $25,000. Fires caused over $350,000 in damages while the Receiver looked the other way.

No genuine dispute of material fact exists on the question of liability. What remains is damages—and this Court should order the case to proceed accordingly.

Like Judge Engoron in *People v. Trump*, this Court should establish fraud as a matter of law. Appoint a mediator for those who wish to settle. Assign a new judge on remand. And set the only remaining issue—DAMAGES—for trial.

Year Six in Case A1905588—and counting. This Court will tell this city, this state, and the United States of America how NOT to run a receivership. History awaits this court's ruling.

Respectfully submitted,

*[signature]*

John Klosterman, Pro Se
Plaintiff-Appellant
5615 Sidney Road
Cincinnati, Ohio 45238
(513) 250-2610
johncklosterman@gmail.com

Dated: February 19, 2026

## CERTIFICATE OF SERVICE

I hereby certify that on February 19, 2026, a true and accurate copy of the foregoing Motion for Partial Summary Judgment was filed via the Court's CM/ECF system or Email providing notice to all counsel of record.

_____
John Klosterman, Pro Se